IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISON

| | | |
|---|---|---|
| James McIngvale | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. _____ |
| Robert A. Baffert; Bob Baffert Racing, | § | |
| Inc.; J.B. McKathan; Kevin McKathan; | § | |
| and McKathan Brothers Farm, L.L.C. | § | |
| | § | |
| *Defendants* | § | |

## PLAINTIFF'S COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, James McIngvale ("McIngvale"), files this his Complaint against Defendants, Robert A. Baffert, Bob Baffert Racing, Inc. (collectively referred to as "Baffert"), J.B. McKathan, Kevin McKathan and McKathan Brothers Farm, L.L.C. (collectively referred to as the "McKathan Brothers") ("Baffert" and the "McKathan Brothers," as previously defined, are jointly referred to herein as "Defendants"), and for cause of action would respectfully show this Honorable Court as follows:

### I.      Parties

1.     Plaintiff, James McIngvale, is an individual who is a citizen of the State of Texas.

2.     Defendant, Robert A. Baffert, is an individual who is a citizen of the State of California, and he may be served with process at 285 W. Huntington Drive, Arcadia, California 91007.

3.     Defendant, Bob Baffert Racing, Inc., is a corporation with its principal place of business in the State of California.  Bob Baffert Racing, Inc. may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service of

process because Bob Baffert Racing, Inc. regularly engages in business activities in the State of Texas, but does not maintain a regular place of business in the State of Texas and has not designated an agent for service of process.

4.      Defendant, J.B. McKathan, is an individual who is a citizen of the State of Florida, and he may be served with process at 2680 NE 37th Place Road, Ocala, Florida 32686.

5.      Defendant, Kevin McKathan, is an individual who is a citizen of the State of Florida, and he may be served with process at 9804 NW 30th Ave., Ocala, Florida 34475.

6.      Defendant, McKathan Brothers Farm, L.L.C., is a limited liability company with its principal place of business in the State of Florida.  McKathan Brothers Farm, L.L.C. may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service of process because McKathan Brothers Farm, L.L.C. regularly engages in business activities in the State of Texas, but does not maintain a regular place of business in the State of Texas and has not designated an agent for service of process.

## II.      Jurisdiction and Venue

7.      This Honorable Court has jurisdiction over the above-styled cause, pursuant to 28 U.S.C. § 1332(a)(1),  because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

8.      Venue is proper in the Southern District of Texas, pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to the causes of action asserted herein occurred in the Southern District of Texas and a substantial part of the property at issue is situated in the Southern District of Texas.

## III.      Conditions Precedent

9.      All conditions precedent have been performed or have occurred. *See* Fed. R. Civ. P. 9(c).

## IV.   Factual Overview

10.   The business of purchasing and selling thoroughbred racehorses is a billion dollar industry that involves a high degree of risk.  Thoroughbred racehorses are bought and sold through private sales and public auctions and each sale is unique.  Given the high degree of risk involved in such transactions and the specialized nature of the thoroughbred racehorse industry, buyers and sellers of thoroughbred racehorses typically employ agents with specialized knowledge to provide expert advice and counsel, as well as represent their interest, in any given transaction.

11.   In a typical transaction, a buyer of a thoroughbred racehorse will employ a bloodstock agent, a trainer and a veterinarian to provide him or her expert advice and counsel on a number of different issues, including but not limited to the blood line, the race history, the general medical condition and the value of a particular horse.  Whereas, a seller of a thoroughbred racehorse will typically employ a consigner to provide him or her with expert advice on whether to sell a particular horse privately or at auction, the particular auction that should be utilized to sell a particular horse, the efforts that need to be undertaken prior to the auction and the price that one should expect to receive for a particular horse.  In each transaction, buyer and seller are relying upon the knowledge, skill and candor of the individuals they have employed to represent their interest as fiduciaries on each transaction.

12.   McIngvale has long been intrigued by the thoroughbred racehorse industry.  This intrigue caused McIngvale to enter the thoroughbred racehorse industry.

13.   In early 2001, J.B. McKathan approached McIngvale in an attempt to become McIngvale's bloodstock agent.  After some discussions regarding the McKathan Brothers' approach to the thoroughbred racehorse industry, McIngvale and the McKathan Brothers entered

into an oral agreement whereby the McKathan Brothers would represent McIngvale as his bloodstock agent.   In exchange for their expert advice and counsel, McIngvale agreed to pay the McKathan Brothers five percent (5%) of the purchase price of any horse purchased on his behalf. The foregoing payments were separate and apart from the purchase price and such payments were to be paid directly to the McKathan Brothers by McIngvale.

14.     Shortly after entering into the foregoing business relationship, the McKathan Brothers introduced McIngvale to Baffert and recommended that McIngvale hire Baffert as an advisor and trainer.   Based on the McKathan Brothers' recommendation and Baffert's representations, McIngvale agreed to retain Baffert as an advisor and trainer.

15.     From 2001 through August of 2004, Defendants, acting as McIngvale's agents and fiduciaries, advised and counseled McIngvale on the various thoroughbred racehorses that he should acquire.   During the foregoing time period McIngvale purchased a large number of thoroughbred racehorses and each year spent several million dollars on the acquisition of thoroughbred racehorses recommended by Defendants.  At all times, Defendants were acting as McIngvale's agents and fiduciaries and as such they had a duty and responsibility to refrain from self-dealing, to act with integrity of the strictest kind, to not take advantage of their position and influence, to fully disclose any and all material facts, to not conceal any facts that might influence McIngvale's decisions, to properly manage and safeguard McIngvale's funds and to properly account for all funds entrusted to them.   Additionally, at all times, Defendants were aware that McIngvale was relying solely upon their advice and counsel in the purchase of thoroughbred racehorses.

16.     At all times during their business relationship, McIngvale relied on the honesty, integrity and expertise of Defendants.  McIngvale based his decision on whether to acquire a particular

thoroughbred racehorse on the advice and counsel of Defendants, as McIngvale was led to believe Defendants were being truthful, honest and candid in their dealings.

17.     Recently, a number of disreputable business activities have been uncovered within the thoroughbred racehorse industry, including secret commissions, kickbacks and fraudulent sales. These disreputable business activities are inherently undiscoverable through the use of reasonable diligence and to determine whether the foregoing business activities occurred one must conduct an investigation specifically designed to ascertain whether any fraudulent or illegal activity occurred.  Thus, McIngvale decided to undertake an investigation to determine whether he was treated in a fair and legal manner for the thoroughbred racehorses he purchased based on Defendants' representations and recommendations.

18.     Through the foregoing investigation, McIngvale was informed and believes Defendants received secret commissions and kickbacks on various thoroughbred racehorses he purchased based on Defendants' representations and recommendations.  At the time that Defendants received the foregoing secret commissions and kickbacks, they were acting as McIngvale's fiduciaries and thus, they had a duty to disclose any conflict of interest and refrain from any self-dealing.  Despite their legal obligation to do so, Defendants did not reveal the secret commissions and kickbacks they received on the thoroughbred racehorses they recommended and purchased on behalf of McIngvale.  However, during the course of McIngvale's investigation, J.B. McKathan confessed to McIngvale that he did in fact receive secret commissions and kickbacks on thoroughbred racehorses Defendants recommended and purchased on behalf of McIngvale.

19.     An example of how Defendants obtained the foregoing secret commissions and kickbacks is the purchase of Work, a Menifee and Pacific City colt that was purchased by

McIngvale for $950,000 at the Keenland two-year old sale in 2003. McIngvale purchased the foregoing thoroughbred racehorse based on the advice and counsel of Defendants, despite the significant purchase price. In addition to paying the foregoing purchase price, McIngvale paid the McKathan Brothers a five percent (5%) commission, which totaled $47,500, on the purchase of Work, pursuant to his oral agreement with the McKathans. Unbeknownst to McIngvale, based on information and belief, Defendants had already arranged to receive a ten percent (10%) secret commission from the seller of Work. In fact, the foregoing secret commission and kickback was received on June 25, 2003. *See* Exhibit A. Based on information and belief, Defendants split the foregoing secret commission and kickback amongst themselves. The foregoing secret commission and kickback was never disclosed to McIngvale, despite the fact that Defendants had a strict duty to disclose all such information.

### V.      Causes of Action

*Breach of Fiduciary Duty and Constructive Fraud*

20.      McIngvale incorporates by reference the allegations set forth in Paragraphs 1 through 19 of this Complaint.

21.      Defendants entered into a business relationship with McIngvale to provide him expert advice and counsel on the purchase of various thoroughbred racehorses. The fiduciary relationship that existed between McIngvale and Defendants was one of trust and confidence that required Defendants to comply with strict legal obligations. Specifically, Defendants had a duty and responsibility to refrain from self-dealing, to act with integrity of the strictest kind, to not take advantage of their position and influence, to fully disclose any and all material facts, to not conceal any facts that might influence McIngvale's decisions, to properly manage and safeguard McIngvale's funds and to properly account for all funds entrusted to them.

22.     Defendants knowingly and intentionally breached all of the foregoing duties when they arranged the receipt of secret commissions and kickbacks on the thoroughbred racehorses they were advising McIngvale to purchase.

23.     Defendants knowingly and intentionally breached the duties owed to McIngvale so they could unlawfully enrich themselves at the expense of McIngvale.  Defendants' impermissible actions caused McIngvale to sustain economic damages that are recoverable under the law.

24.     McIngvale is entitled to recover his actual damages, as well as exemplary damages as a result of Defendants' unlawful conduct.  Additionally, McIngvale seeks equitable relief in the form of a constructive trust over the proceeds obtained as a result of Defendants' breach of their fiduciary duties, the forfeiture of all fees paid to Defendants, disgorgement of all secret commissions and kickbacks received by Defendants and rescission of all transactions in which Defendants breached their fiduciary duties.

*Fraud by Nondisclosure*

25.     McIngvale incorporates by reference the allegations set forth in Paragraphs 1 through 24 of this Complaint.

26.     Defendants concealed and failed to disclose to McIngvale that they received secret commissions and kickbacks on the thoroughbred racehorse Defendants purchased on his behalf, despite the fact that Defendants had a duty to disclose such information.

27.     The fact that Defendants received secret commissions and kickbacks was material because such information would have affected McIngvale's decision to purchase a particular thoroughbred racehorse and such information would have changed the way that McIngvale viewed the information received from his agents and fiduciaries.

28.     Defendants knew that McIngvale was not aware they were receiving secret commissions and kickbacks on the thoroughbred racehorses they recommended to him.   Additionally, McIngvale did not have an equal opportunity to discover the duplicitous acts of his agents and fiduciaries.

29.     Defendants deliberately failed to disclose and intentionally concealed they were receiving secret commissions and kickbacks from the sellers of the horses they advised McIngvale to purchase.

30.     Defendants' failure to disclose their secret commissions and kickbacks was intentional and was designed to induce McIngvale to proceed with the purchase of various thoroughbred racehorses.   McIngvale did, in fact, rely upon Defendants' failure to disclose their secret commissions and kickbacks and purchased various thoroughbred racehorses recommended by Defendants.

31.     McIngvale suffered actual damages as a result of Defendants' fraudulent nondisclosure because McIngvale made economic decisions he would not have made if Defendants had disclosed they were receiving secret commissions and kickbacks on the thoroughbred racehorses they recommended. Additionally, Defendants' intentional, unlawful and fraudulent conduct entitles McIngvale to recover exemplary damages.

32.     In addition to the actual and exemplary damages sought herein, McIngvale seeks the equitable remedy of rescission for all transactions in which Defendants received a secret commission or kickback based on their representations and recommendations.

*Breach of Contract*

33.     McIngvale incorporates by reference the allegations set forth in Paragraphs 1 through 32 of this Complaint.

34.     McIngvale and Defendants had an oral contract whereby Defendants would provide McIngvale expert advice and specialized counsel on the purchasing and training of various thoroughbred racehorses and in exchange McIngvale agreed to pay for these services.

35.     McIngvale complied with his contractual obligations by paying the agreed upon monetary sum for the services provided by Defendants.  However, Defendants did not comply with their contractual obligations.  Specifically, Defendants materially breached their contractual obligations when they failed to provide the services sought, failed to perform their contractual obligations with the care, skill and faithfulness required and failed to act in good faith.

36.     Defendants' material breach caused McIngvale to sustain actual damages that are recoverable under the law.

*Accounting*

37.     McIngvale incorporates by reference the allegations set forth in Paragraphs 1 through 36 of this Complaint.

38.     Based on the fiduciary relationship that existed between McIngvale and Defendants and the number of thoroughbred racehorse that Defendants recommended and purchased on behalf of McIngvale, McIngvale seeks a specific accounting of all business activities conducted by Defendants on his behalf, as well as an accounting of any and all payments, secret commissions, kickbacks, commissions or any other type of compensation received by Defendants that in any way relates to or is associated with the purchase of thoroughbred racehorses on behalf of McIngvale.

*Conspiracy*

39.     McIngvale incorporates by reference the allegations set forth in Paragraphs 1 through 38 of this Complaint.

40.     Defendants conspired to breach the fiduciary duties owed to McIngvale and conspired to commit fraud by nondisclosure. Defendants, acting in concert with one another, arranged for the receipt of secret commissions and kickbacks on the various thoroughbred racehorses that McIngvale purchased based on their representations and recommendations. Defendants committed unlawful acts when they failed to disclose to McIngvale that they were receiving secret commissions and kickbacks on the thoroughbred racehorses that McIngvale purchased based on their representations and recommendations.

41.     Defendants are jointly and severally liable for the damages sustained by McIngvale for Defendants' breach of their fiduciary duties, as well as the damages sustained by McIngvale as a result of Defendants' fraud by nondisclosure.

*Assisting, Encouraging and Participating in Unlawful Acts*

42.     McIngvale incorporates by reference the allegations set forth in Paragraphs 1 through 41 of this Complaint.

43.     Each Defendant worked together to commit wrongful acts against McIngvale. These wrongful acts include systematic and serial breaches of the strict fiduciary duties they each owed McIngvale.

44.     Defendants knew they should have disclosed all commissions they would receive and all commissions they did receive on transactions involving McIngvale. Defendants assisted each other in concealing all secret commissions and kickbacks they received by agreeing to hide their wrongful acts from McIngvale.

45.     Defendants assisted, encouraged and recommended specific thoroughbred racehorses, which they knew would pay secret commissions and unlawful kickbacks to them. This

assistance, which each Defendant provided to the other, was a substantial factor in allowing their unlawful conduct to go undiscovered until now.

46.     Defendants actively assisted and encouraged each other in breaching their fiduciary duties and fraudulently concealing facts, which they knew should have been disclosed to McIngvale.  This assistance and encouragement was a substantial factor in causing the damages sought by McIngvale in this lawsuit.

47.     Defendants are jointly and severally liable for all damages sustained by McIngvale resulting from their unlawful conduct.

### VI.     Request for Relief

Wherefore, based on the foregoing, Plaintiff, James McIngvale, respectfully request that he be given a judgment against Defendants, Robert A. Baffert, Bob Baffert Racing, Inc. J.B. McKathan, Kevin McKathan and McKathan Brothers Farm, L.L.C., jointly and severally, for the following:

a.   All economic loss caused by Defendants unlawful acts;
b.   Exemplary damages;
c.   A constructive trust over all proceeds wrongfully obtained by Defendants;
d.   Disgorgement of all secret commissions and kickbacks received by Defendants;
e.   Rescission of all transactions in which Defendants breached their fiduciary duties;
f.   An accounting;
g.   Reasonable attorneys' fees;
h.   Pre and post judgment interest;
i.   Costs of Court; and
j.   Any and all other relief, at law or in equity, that Plaintiff may show himself to be justly entitled to receive.

Respectfully submitted,

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & MARTIN, P.C.

By:_____ /s/ *William H. Stout*_____
        WILLIAM H. STOUT
        TBN:  24047620
        ADM:  574839
        1200 Smith Street, Suite 1400
        Houston, Texas 77002
        (713) 654-9689 – Telephone
        (713) 356-1089 – Facsimile


SPAGNOLETTI & CO.

By:_____ /s/ *Francis I. Spagnoletti*_____
        Francis I. Spagnoletti
        TBN:  18869600
        1600 Smith Street, 45th Floor
        Houston, Texas 77002
        (713) 653-5600 – Telephone
        (713) 653-5656 – Facsimile

**ATTORNEYS FOR PLAINTIFF JAMES
MCINGVALE**

OF COUNSEL:

CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & MARTIN, P.C.
DANIEL D. PIPITONE
TBN:  16024600
ADM:  0294
Christopher P. Graham
TBN:  24002169
ADM:  22042
1200 Smith Street, Suite 1400
Houston, Texas 77002
(713) 654-9070 – Telephone
(713) 356-1070 – Facsimile

# EXHIBIT A

Account #                                                                 Page 1 of 1

MURRAY SMITH TRAINING STABLE 03-00                    COMMUNITY BANK OF MARION COUNTY          4319
8011 NW 46TH ST.                                      OCALA, FLORIDA 34482
OCALA, FL 34482                                       63-1436/631
352-629-6675

                                                                           6/25/03

Pay to the
Order of    Our Team   LLC                                    $95,000.00

Ninety five thousand                                                    Dollars

memo  10% Comm. on Monifer-Pacific Cats

⑆004319⑆ ⑆0631⑆1436⑆ 063⑆000074⑆              /0009500000/

07/01/2003  4319  $95,000.00

07/01/2003  4319  $95,000.00

BANK OF AMERICA, NA